Villa Capriani Homeowners Ass'n v. Lexington Ins. Co., 2021 NCBC 67.

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

VILLA CAPRIANI HOMEOWNERS ASSOCIATION, INC.,

Plaintiff,

v.

LEXINGTON INSURANCE COMPANY; CERTAIN UNDERWRITERS SUBSCRIBING TO POLICY NO. P09397/2017; CERTAIN UNDERWRITERS SUBSCRIBING TO POLICY NO. P07592/2017; SFI GROUP, INC.; and JEFFREY SCOTT WHEELER,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 2703

**ORDER AND OPINION ON MOTIONS TO DISMISS**

THIS MATTER comes before the Court upon the Motion to Dismiss Second Amended Complaint by Certain Underwriters (ECF No. 35) and the Agency Defendants' Renewed Motion to Dismiss (ECF No. 42).

THE COURT, having considered the Motions, the parties' briefs, the arguments of counsel, and all applicable matters of record, **CONCLUDES** that the Motions should be **GRANTED**, in part, and **DENIED**, in part, as set forth below.

*Allen & Pinnix, P.A., by Noel L. Allen, and Kabateck, LLP, by Marina R. Pacheco, Michael Childress, Christopher B. Noyes, Shant A. Karnikian, and Barret T. Alexander, for Plaintiff Villa Capriani Homeowners Association, Inc.*

*Phelps Dunbar, LLP, by Thomas Contois and Anna P. Cathcart, for Defendant Lexington Insurance Company.*

*Wilson Elser Moskowitz Edelman & Dicker, LLP, by Erik Tomberg and Kathryn Anne Grace, for Defendants Certain Underwriters Subscribing to Policy No. P09397/2017 and Certain Underwriters Subscribing to Policy No. P07592/2017.*

*Manning, Fulton & Skinner, P.A., by Brianne M. Glass and Michael T. Medford, for Defendants Jeffrey Scott Wheeler and SFI Group, Inc.*

Davis, Judge.

## INTRODUCTION

1. This matter involves claims for insurance coverage made by a homeowners' association arising out of damage caused by Hurricane Florence, which ravaged the North Carolina coast in September 2018. The complaint asserts claims for breach of contract, bad faith, unfair and deceptive trade practices, and negligence related to multiple property insurance policies obtained by the homeowners' association to insure its large oceanfront property—and the hundreds of condominiums therein—in Onslow County. The named defendants have asserted motions to dismiss several of the homeowners' association's claims on a variety of legal theories.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to the complaint or referred to in the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681 (1986); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3.     Plaintiff Villa Capriani Homeowners Association, Inc. ("Plaintiff")[1] is the owner and operator of a large oceanfront property consisting of hundreds of condominium units located in Onslow County, North Carolina (the "Insured Property"). (ECF No. 33, at ¶ 1.)

4.     On September 14, 2018, Hurricane Florence made landfall on North Carolina's coast, causing significant loss and damage to the Insured Property. (ECF No. 33, at ¶¶ 6–7.) Wind and water damaged the roofs, the exterior cladding, the unit interiors, the windows, and the balcony doors of the Insured Property. (*Id.*) Additionally, Plaintiff lost a significant amount of homeowners' association dues as a result of the hurricane damage and its consequences. (*Id.*)

5.     As of the date of Hurricane Florence, Plaintiff had obtained commercial property insurance coverage on the Insured Property with Defendant Lexington Insurance Company ("Lexington").[2] (*Id.* at ¶ 8)

6.     During this same time period, Plaintiff also had obtained two other insurance policies that are relevant to this action. They consisted of primary flood coverage and "follow-form"[3] excess flood coverage. These two policies were obtained

---

[1] Plaintiff is a North Carolina nonprofit corporation with its principal place of business in Greensboro, North Carolina. (ECF No. 33, at ¶ 1.)

[2] The parent company of Lexington is American International Group, Inc. ("AIG"). AIG is incorporated in Delaware with its principal place of business in Boston, Massachusetts, and is registered and licensed to engage in the business of insurance in the State of North Carolina. (*Id.* at ¶ 2.)

[3] A "follow-form" excess insurance policy "covers a liability loss that exceeds the underlying limits [of the underlying policy] only if the loss is covered by the underlying insurance." 1 LNPG: NEW APPLEMAN NC INSURANCE LITIGATION § 10.09(2) (LexisNexis 2021).

from two insurance carriers that are separate and distinct entities despite the fact that both of them exist under the "umbrella" of Lloyd's of London ("Lloyd's"). The *primary* flood coverage was issued by Defendant Certain Underwriters Subscribing to Policy No. P09397/2017 (the "Primary Underwriters"). The *excess* flood coverage was issued by Defendant Certain Underwriters Subscribing to Policy No. P07592/2017 (the "Excess Underwriters").[4] For clarity, the Court will refer to the three policies relevant to the pending motions for the remainder of this Opinion as the Lexington Policy (issued by Lexington), the Primary Flood Policy (issued by the Primary Underwriters), and the Excess Flood Policy (issued by the Excess Underwriters).[5]

7. Following Hurricane Florence, Plaintiff notified Defendants[6] on September 15, 2018 of the losses and damage it had sustained from the hurricane. (ECF No. 33, at ¶ 13.) Among the losses asserted by Plaintiff was a claim for unpaid homeowners' association dues. (*Id.* at ¶ 14.) However, Defendants failed to pay the full amounts under the policies demanded by Plaintiff. (*Id.* at ¶¶ 15–19.)

8. On October 2, 2020, Plaintiff filed an initial Complaint in this matter in Superior Court, Onslow County. (ECF No. 3.) Plaintiff filed its First Amended

---

[4] There were actually two layers of excess flood insurance on the Insured Property. However, Plaintiff's claims against the underwriters of the *second* layer—Certain Underwriters Subscribing to Policy No. P09396/2017—were voluntarily dismissed by stipulation, without prejudice, on December 3, 2020. (ECF No. 16.)

[5] The parties are encouraged to use this same nomenclature in future filings with the Court.

[6] The Court observes that throughout its pleading Plaintiff often refers collectively to "Defendants"—without differentiating between the various entities named as Defendants.

Complaint on November 5, 2020. (ECF No. 4.) On November 18, 2020, this matter was designated a mandatory complex business case and assigned to the Honorable Gregory P. McGuire. (Design. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)

9. On February 12, 2021, the Court granted leave for Plaintiff to file a Second Amended Complaint. (ECF No. 33; *see* ECF No. 34, at p. 2.) The parties named as defendants in the Second Amended Complaint are Lexington, the Primary Underwriters, the Excess Underwriters, SFI Group, Inc. ("SFI"), and Jeffrey Scott Wheeler.[7] SFI is the insurance agency that procured the insurance coverage at issue for Plaintiff, and Wheeler is the vice-president of SFI, who acted as an insurance broker for Plaintiff. (*Id*. at ¶ 4.)[8]

10. In its Second Amended Complaint, Plaintiff essentially alleges that: (a) Lexington, the Primary Underwriters, and the Excess Underwriters have wrongfully failed to pay for all of Plaintiff's covered losses sustained during Hurricane Florence and have engaged in various acts of bad faith during the claims process; and (b) the Agency Defendants negligently failed to procure insurance coverage that would specifically cover Plaintiff's loss of homeowners' association dues as a result of the hurricane damage.

---

[7] To make matters even more confusing, Plaintiff's pleading refers to Lexington as "AIG" and refers to the Primary Underwriters and the Excess Underwriters collectively (without differentiating between the two) as "Lloyd's." In this Opinion, the Court occasionally uses the term "Lloyds" when summarizing the claims as pled by Plaintiff in the Second Amended Complaint.

[8] SFI and Wheeler are referred to collectively throughout this Opinion as the Agency Defendants.

11.    The Second Amended Complaint asserts claims for: (1) breach of contract against Lexington; (2) breach of contract against "Lloyds"; (3) bad faith against Lexington; (4) bad faith against "Lloyds"; (5) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") against Lexington; (6) violation of the UDTPA against "Lloyds"; (7) "reformation of contract" against Lexington; and (8) negligence against the Agency Defendants.  (ECF No. 3, at ¶¶ 25–101.)

12.    On March 1, 2021, the Primary Underwriters and the Excess Underwriters filed a Motion to Dismiss pursuant to Rule 12(b)(6) seeking (1) dismissal of the breach of contract claim as to the Excess Underwriters; and (2) dismissal of the bad faith and UDTPA claims against both the Primary Underwriters and the Excess Underwriters.  (ECF No. 35.)

13.    On March 4, 2021, the Agency Defendants filed a Motion to Dismiss, seeking Rule 12(b)(6) dismissal of the sole claim against them for negligence.  (ECF No. 42.)[9]

14.    This matter was reassigned to the undersigned on July 1, 2021. (Reassign. Ord., ECF No. 55.)

15.    On July 29, 2021, this matter came before the Court for a hearing on the parties' pending motions.  The Motions are now ripe for resolution.

**LEGAL STANDARD**

16.    A motion to dismiss pursuant to Rule 12(b)(6) "tests the legal sufficiency of the complaint."  *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C. App. 678,

---

[9] Lexington is the only named Defendant that has not filed a motion to dismiss some or all of the claims asserted in the Second Amended Complaint.

681 (1986) (citation omitted). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987) (citation omitted). In deciding a Rule 12(b)(6) motion to dismiss, the court construes the complaint liberally and accepts all well-pleaded factual allegations as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018) ("When reviewing a complaint dismissed under Rule 12(b)(6), we treat a plaintiff's factual allegations as true." (citation and internal quotation marks omitted)); *Laster v. Francis*, 199 N.C. App. 572, 577 (2009) (stating that allegations in a plaintiff's complaint "are liberally construed and generally treated as true"). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. HHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted).

17. Furthermore, the Court may consider insurance policies that are the subject of a plaintiff's complaint without converting a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *See Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (stating that the court may consider any documents attached to or incorporated within the complaint without converting a motion to dismiss into a motion for summary judgment); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (stating that the court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint

specifically refers even though they are presented by the defendant" (citation omitted)). Accordingly, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster*, 199 N.C. App. at 577 (citations omitted).[10]

18.    "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)).

## ANALYSIS

### A. Motion to Dismiss of the Underwriter Defendants

#### i.    Breach of contract claim

19.    In its second cause of action in the Second Amended Complaint, Plaintiff has asserted a breach of contract claim against "Lloyds" (*i.e.*, both the Primary Underwriters and the Excess Underwriters) for their alleged "failure and refusal . . . to pay the compensation as [they are] obligated to do so" under the terms of the Primary Flood Policy and the Excess Flood Policy.  (ECF No. 33, at ¶ 40.)  Plaintiff

---

[10] In its briefs in response to the pending motions to dismiss, Plaintiff took the position that the Court could not consider the insurance policies referenced in the Second Amended Complaint on a Rule 12(b)(6) motion, even though the policies were referenced in the Second Amended Complaint and attached to pleadings filed by Defendants.  At the July 29, 2021 hearing on the Motions, however, counsel for Plaintiff conceded that North Carolina law permits the Court to consider the insurance policies in deciding the pending Rule 12(b)(6) motions.

alleges that it "has been damaged in an amount in excess of the policy limits of the Primary [Flood] Policy." (*Id.* at ¶ 42.)

20. The motion seeks dismissal of this claim—solely as applied to the *Excess Underwriters*—on the grounds that (a) the Excess Underwriters' obligations under the Excess Flood Policy are not triggered unless and until the underlying limits of the Primary Flood Policy are exhausted; and (b) the Second Amended Complaint does not allege that the full amount of coverage under the Primary Flood Policy has been paid in full or otherwise exhausted.

21. In response, Plaintiff argues that its breach of contract claim against the Excess Underwriters, as pled, is sufficient to survive a Rule 12(b)(6) motion. Specifically, Plaintiff points to its allegations in the Second Amended Complaint that (a) "Defendants wrongfully denied and underpaid Plaintiff's claims" and "failed to perform contractual duties to compensate Plaintiff"; and (b) Plaintiff's damages *exceed* the policy limits of the Primary Flood Policy.

22. It is well established under North Carolina law "that an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011) (internal quotation marks omitted) (quoting *Fid. Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380 (1986)). "In North Carolina, determining the meaning of language in an insurance policy presents a question of law for the Court." *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020). Thus, our Supreme Court has

instructed that "[w]hen interpreting an insurance policy, courts apply general contract interpretation rules." *Id*.

23. Our Supreme Court has made clear that

> [t]he cardinal principle pertaining to the construction and interpretation of insurance contracts is that the intention of the parties should control. If not ambiguous or uncertain, the express language the parties have used should be given effect, and the intention of the parties must be derived from the language employed. . . . If the intention of the parties is clear, the courts have no authority to change the contract in any particular [way] or to disregard the express language the parties have used.

*Lineberry v. Trust Co.*, 238 N.C. 264, 267 (1953); *see also C.D. Spangler Constr. Co. v. Industrial Crankshaft & Engineering Co.*, 326 N.C. 133, 142 (1990) (stating that, in discerning the parties' intent, "[t]he various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect" (quoting *Woods v. Insurance Co.*, 295 N.C. 500, 506 (1978))); *Cowell v. Gaston Cty.*, 190 N.C. App. 743, 746 (2008) (stating that the "intention of the parties as gathered from the language used in the policy is the polar star that must guide the courts").

24. In analyzing the Excess Underwriters' motion, it is important to understand the distinction between primary and excess insurance coverage. "Primary coverage attaches immediately upon the happening of an occurrence, or as soon as a claim is made." 4 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 24.02[1] (2021). In contrast, "[a]n excess policy provides specific coverage above an underlying limit of primary insurance" and "coverage generally is not triggered until

the underlying primary limits are exhausted by way of judgments or settlements." *Id.* at § [2][a]; *see also Universal Ins. Co. v. Burton Farm Dev. Co., LLC*, 216 N.C. App. 469, 479 (2011) ("Excess insurance clauses generally provide that if other valid and collectible insurance covers the injury in question, the 'excess' policy will provide coverage only for liability above the maximum coverage of the primary policy."); *Fieldcrest Cannon v. Fireman's Fund Ins. Co.*, 127 N.C. App. 729, 733 (1997) (holding that excess carrier "could not be liable for the underlying [ ] claims unless and until the primary insurers' coverage limits were paid" where the "parties had agreed that the [underlying] claims would not exceed the [primary policy's] coverage limits"); *N.C. Ins. Guar. Ass'n v. Century Indem. Co.*, 115 N.C App. 175, 185–86 (1994) ("The fundamental purpose of excess insurance is to protect the insured against excess liability claims[.]"); *Horace Mann Insurance Co. v. Continental Casualty Co.*, 54 N.C. App. 551, 555 (1981) (stating that excess insurance policies generally provide "that if other valid and collectible insurance covers the occurrence in question, the 'excess' policy will provide coverage only for liability above the maximum coverage of the primary policy").

25. Here, the Excess Flood Policy provides, in pertinent part, as follows:

**3. LIMIT**

Provided always that *liability attaches to the Underwriters only after the Primary and Underlying Excess Insurer(s) have paid or have admitted liability for the full amount of their respective Ultimate Net Loss liability* as set forth in Item 9 of the Schedule and designated "Primary and Underlying Excess Limit(s)" and then the limits of Underwriters Liability shall be those set forth in Item 10 of the Schedule under the designation "Excess Limit(s)"

and the Underwriters shall be liable to pay the ultimate net loss up to the full amount of such "Excess Limit(s)".

("Exhaustion Clause," ECF No. 37.2, at p. 14, ¶ 3 (emphasis added).)[11]

26.     The Excess Flood Policy further states, in pertinent part:

**5.  UNCOLLECTIBILITY OF OTHER INSURANCE**

Notwithstanding any of the terms of this Insurance that might be construed otherwise, the insurance provided by this Policy shall always be excess over the maximum monetary limits set forth in Item 9 of the Schedule regardless of the uncollectibility (in whole or in part) of any underlying insured amounts for any reason, including, but not limited to, the financial impairment or insolvency of an underlying Insurer(s).

(*Id*. at p. 14, ¶ 5.)

27.     Plaintiff's Second Amended Complaint does not contain any allegation that the Primary Underwriters have either paid or admitted liability for the full amount of the Primary Flood Policy's limits (*i.e.*, $500,000).  Although Plaintiff has alleged that its damages exceed the Primary Flood Policy's limits, the Court finds that this allegation—by itself— is not enough to trigger the excess coverage based on the clear and unambiguous terms of the Excess Flood Policy quoted above.

28.     Because North Carolina's appellate courts have not addressed the issue of whether a claim against an excess insurer can survive a Rule 12(b)(6) motion under

---

[11] Although the above-quoted provision of the policy references "Underlying Excess Insurer(s)," the parties in this case appear to agree that no "underlying excess insurer" exists. In other words, the Excess Flood Policy issued by the Excess Underwriters is the *only* excess policy at issue in connection with the motions presently before the Court.  The "Primary" policy referenced in the above-quoted provision refers to the Primary Flood Policy issued by the Primary Underwriters.

the present circumstances, the Court finds it helpful to examine cases from other jurisdictions. *See Carolina Power & Light Co. v. Employment Sec. Comm'n of N.C.*, 363 N.C. 562, 569 (2009) (noting that although cases from other jurisdictions are not binding on issues of North Carolina law, they may be considered to the extent they are instructive).

29. Several courts in other jurisdictions have interpreted similar excess insurance policy language to mean that the excess coverage would not be reached until such time as the limits under the primary policy were exhausted. *See, e.g., Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 73 Cal. Rptr. 3d 770, 778–781 (Cal. Ct. App. 2008) (affirming trial court's order sustaining excess insurer defendant's demurrer where the trial court found the excess policy was not triggered due to the fact that the parties to the primary policy had settled for less than the primary policy limits and the language of the excess policy stated that the excess insurer would only be liable after the underlying insurers "have paid or have been held liable to pay the full amount of the Underlying Limit of Liability"); *see also Citigroup, Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 372 (5th Cir. 2011) (affirming district court's ruling that the excess policy was not triggered where underlying insurer settled for less than policy limits and language of the excess policy stated that "coverage does not attach until the underlying policy's 'total' limit of liability has been paid 'in legal currency' "); *Comerica Inc. v. Zurich Am. Ins. Co.*, 498 F. Supp. 2d 1019, 1034 (E.D. Mich. 2007) (finding that excess insurance policy would not be triggered

until primary policy's limits are exhausted "by actual payment of claims" as required by "unambiguous language of the excess policy").

30. Plaintiff has not alleged that either of the unambiguous pre-conditions to the triggering of the Excess Flood Policy have been met—that is, payment in full by the Primary Underwriters of the full amount of the Primary Flood Policy's coverage limits *or* admission of liability by the Primary Underwriters for the full policy amount.[12] Therefore, the Court CONCLUDES that Plaintiff's breach of contract claim against the Excess Underwriters is premature. Accordingly, the Excess Underwriters' motion to dismiss this claim is GRANTED without prejudice to Plaintiff's right to reassert this claim at a later date should either of the pre-conditions triggering coverage occur.

### ii. Bad Faith/ UDTPA Claims

31. In its fourth and sixth causes of action, Plaintiff has asserted a bad faith claim pursuant to N.C.G.S. § 58-63-15(11) and a UDTPA claim pursuant to N.C.G.S. § 75-1.1, et seq., based largely on its allegations that "Lloyds" did not "attempt in good faith to effectuate a prompt, fair, and equitable settlement of [Plaintiff's] claims." (ECF No. 33, at ¶¶ 57–70.)

32. Once again, these two claims make no attempt to distinguish between the Primary Underwriters and the Excess Underwriters—instead referring to them collectively as "Defendant Lloyds." Both the Primary Underwriters and the Excess

---

[12] Indeed, given the fact that Plaintiff has asserted a breach of contract claim against the Primary Underwriters based on its refusal to pay the full policy limits, it is clear that neither of these pre-conditions have been satisfied.

Underwriters argue that these claims should be dismissed because Plaintiff has failed to specify which actions were taken by the Primary Underwriters and which were taken by the Excess Underwriters, "leaving [the Excess and the Primary] Underwriters and the Court to guess which allegations are attributable to which entity." The Primary Underwriters also argue that because they have admitted their policy provides *some* degree of coverage for Plaintiff's claimed damages based on a "reasonable interpretation" of the policy, a "mere disagreement" as to the *amount* of proceeds to which Plaintiff is due under the Primary Flood Policy cannot support a bad faith or UDTPA claim.

33. Plaintiff, conversely, argues that its allegations in the Second Amended Complaint are sufficient to put the Primary and Excess Underwriters on notice of the bad faith and UDTPA claims against them. Furthermore, Plaintiff argues that the allegations in the Second Amended Complaint demonstrate more than just a "mere disagreement" as to coverage and are sufficient to assert valid bad faith and UDTPA claims.

34. In order to establish a *prima facie* case for bad faith refusal to pay insurance benefits,

> [a] plaintiff must allege that the insurer has acted in bad faith by refusing to settle or negotiate with the plaintiff and that the insurers' actions have been a misuse of power and authority tantamount to outrageous conduct reflecting a reckless and wanton disregard of the plaintiff's rights under the insurance policy.

*Johnson v. First Union Corp.*, 128 N.C. App. 450, 458 (1998); *see also Bank of Am. Corp. v. SR Int'l Bus. Ins. Co.*, 2007 NCBC LEXIS 36, at **59 (N.C. Super. Ct. Dec.

19, 2007) (stating that a plaintiff must establish three elements to recover for an insurer's bad faith refusal to settle a claim: (1) refusal to pay after receiving and recognizing a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct).

35.     To state a *prima facie* claim under the UDTPA, a plaintiff must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000); N.C.G.S. § 75-1.1. "[W]hether an act or practice is an unfair or deceptive practice . . . is a question of law for the court." *Gray*, 352 N.C. at 68. "Mere breach of contract is not sufficient to sustain an action for UDTP, but if the breach is surrounded by substantial aggravating circumstances, it may sustain an action for UDTP." *Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 217 (2007).

36.     Conduct that violates N.C.G.S. § 58-63-15(11) constitutes an unfair and deceptive act or practice under the UDTPA because "such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." *Gray*, 352 N.C. at 71; *Country Club of Johnston Cty., Inc. v. U.S. Fid. & Guar. Co.*, 150 N.C. App. 231, 246 (2002). Such conduct includes, among other things, "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverage at issue"; "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies"; "refusing to pay claims without conducting a reasonable investigation based upon all available information"; "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"; and "attempting to settle a claim for less than

the amount to which a reasonable man would have believed he was entitled[.]" N.C.G.S. §§ 58-63-15(11)(a)–(b), (d), (f), and (h).

37. For the reasons discussed at length above, the Court has found that dismissal—without prejudice—of the breach of contract claim brought against the Excess Underwriters is appropriate because liability under the Excess Flood Policy has not yet been triggered. Logically, this means that dismissal is likewise proper as to the bad faith and UDTPA claims brought against the Excess Underwriters. Therefore, these claims are also DISMISSED without prejudice.

38. With respect to the Primary Underwriters, however, the Court reaches a different result. Plaintiff alleges in the Second Amended Complaint that, among other things, "Defendant Lloyd's" has ignored information and data submitted by Plaintiff (ECF No. 33, at ¶¶ 20(a)(ii), 63, 87); failed to perform an adequate investigation of Plaintiff's insurance claim (*Id*. at ¶¶ 20(d)(ii), 60, 85(c)); engaged in delay tactics (*Id*. at ¶¶ 20(b)(ii), 82); misrepresented material facts regarding policy provisions (*Id*. at ¶¶ 20(a)(ii), 85(a)); and failed to timely respond to communications from Plaintiff (*Id*. at ¶¶ 20(f), 68).

39. Although it is true that Plaintiff's Second Amended Complaint directs these allegations at one collective entity—"Defendant Lloyd's"—without differentiating between the Primary Underwriters and the Excess Underwriters, the Court is not persuaded that this has prevented the Primary Underwriters from acquiring notice of the claims brought against them. The Primary Underwriters have argued repeatedly in their briefs that the Excess Underwriters are not a proper party

to this lawsuit in that coverage under the Excess Flood Policy has never been triggered. Therefore, it is not unreasonable to conclude that the Primary Underwriters were put on notice that the assertions in the Second Amended Complaint alleging bad faith and unfair and deceptive acts in the process of evaluating Plaintiff's insurance claim were meant to be directed at them (as opposed to the Excess Underwriters).

40. Furthermore, although the allegations in the Second Amended Complaint are somewhat conclusory and offer little in the way of supporting facts, the Court is not persuaded that they allege a "mere disagreement" as to the extent of coverage. Reading the Second Amended Complaint in the light most favorable to Plaintiff—as the Court is required to do at the Rule 12(b)(6) stage—Plaintiff has alleged conduct that could potentially give rise to liability on theories of bad faith and violation of the UDTPA. *See Gray*, 352 N.C. at 73 (holding that " 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear' is a violation of N.C.G.S. § 75-1.1" and therefore defendant's conduct "constituted an unfair or deceptive act or practice in or affecting commerce that proximately caused injury to plaintiffs"); *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 421–22 (1993) (holding that evidence was sufficient to withstand a motion for directed verdict on bad faith refusal to settle claim where "the jury could reasonably draw the inference that defendant's failure to pay was intentional, in bad faith, and not due to innocent mistake or honest disagreement"); *see also Kielbania v. Indian Harbor Ins. Co.*, 2012 U.S. Dist. LEXIS 127849, at *34–

38 (M.D.N.C. Sept. 10, 2012) (finding that where plaintiffs alleged claims for unfair claim settlement practices under N.C.G.S. § 58-63-15(11) and where multiple factual issues were raised, "it is properly the role of the jury to determine whether [d]efendant failed to attempt in good faith to effectuate prompt and fair settlement, whether [d]efendant's offers to settle were less than an amount which a reasonable man would have believed he was entitled, whether [d]efendant promptly provided a reasonable explanation of the basis of its offers, and whether [d]efendant compelled [p]laintiffs to institute litigation by offering substantially less than the amounts ultimately recovered").

41. Accordingly, the Primary Underwriters' motion to dismiss Plaintiff's bad faith and UDTPA claims is DENIED.

**B. Agency Defendants' Motion to Dismiss**

42. The sole claim brought against the Agency Defendants in the Second Amended Complaint is for negligence based on their alleged failure to procure "dues abatement" coverage as requested by Plaintiff.[13] (ECF No. 33, at ¶¶ 10–11, 96–101.) The Agency Defendants argue that this claim should be dismissed because the Lexington Policy "expressly provides lost income coverage that would apply to Plaintiff's loss of income from homeowners' dues, if any such loss occurred."

43. Our Supreme Court has held that once an agent has procured an insurance contract, the agent is not a party to the contract and is not liable under it "irrespective of any default in the performance thereof by the insurer and irrespective

---

[13] The Court notes that Plaintiff's claims against the Agency Defendants relate solely to the coverage obtained in the Lexington Policy.

of the insured's lack of success in an action against such a defaulting insurer." *Mayo v. American Fire & Casualty Co.*, 282 N.C. 346, 354 (1972). Nevertheless,

> [i]f an insurance agent or broker undertakes to procure for another insurance against a designated risk, the law imposes upon him the duty to use reasonable diligence to procure such insurance and holds him liable to the proposed insured for loss proximately caused by his negligent failure to do so.

*Id.* at 353 (citations omitted); *see also Holmes v. Sheppard*, 255 N.C. App. 739, 744 (2017); *Bentley v. N.C. Ins. Guaranty Ass'n*, 107 N.C. App. 1, 12 (1992).

44. In the Second Amended Complaint, Plaintiff alleges that:

> [a]t the time of the creation of the [Lexington Policy], the initial intent of the Plaintiff and Defendant [Lexington], through its agents SFI Group, Inc. and Jeffrey Scott Wheeler, was to procure coverage for lost dues. However, Defendants SFI and Wheeler failed to use reasonable diligence to procure the requested insurance and issued coverage for Business Income but failed to include the Dues Abatement coverage sought by Plaintiff. *The Business Income coverage procured by Defendants SFI and Wheeler could never trigger payment for Plaintiff as Plaintiff is a Homeowners' Association and it never ceases business. Since payment could never be triggered, the coverage could never be triggered and is therefore illusory.*

(ECF No. 33, at ¶¶ 9–11 (emphasis added and numbered paragraphs omitted).)

45. The Lexington Policy contains a form titled "Business Income (and Extra Expense) Coverage Form," that states, in pertinent part, as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations.

("Business Income Coverage Form," ECF No. 42.1, at 62.)  The Business Income Coverage Form, in turn, defines the term "suspension" as "[t]he *slowdown or cessation* of your business activities[.]" (*Id*. at 70) (emphasis added).

46.     Thus, the Court rejects Plaintiff's argument that the fact that it never actually went out of business renders useless the Business Income coverage as to Plaintiff's claim for loss of dues.  The Court concludes that the above-quoted policy language that is contained within the Business Income Coverage Form is broad enough to encompass Plaintiff's claim for loss of dues.[14]  Based on the clear language of this portion of the policy, the fact that Plaintiff "never ceases business" is not a bar to coverage, and Plaintiff has therefore failed to show why its alleged loss of dues (which are a particular form of "business income") would not be covered under this portion of the Lexington Policy.[15]

47.     Therefore, the allegations supporting Plaintiff's negligence claim against the Agency Defendants are contradicted by the express terms of the Lexington Policy.  Accordingly, the Court CONCLUDES that the Agency Defendants' Motion to Dismiss is GRANTED.

---

[14] Although not a basis for the Court's ruling on this issue, the Court notes that at the July 29, 2021 hearing on the pending Motions, counsel for Lexington expressly represented to the Court that Lexington was not disputing that coverage is, in fact, provided under the Lexington Policy for the category of damages that Plaintiff refers to as "dues abatement."

[15] The Agency Defendants further argue that additional coverage for Plaintiff's alleged loss of dues exists under a separate section of the Lexington Policy—the "Condominium Amendatory Endorsement."  However, in light of the Court's ruling that "dues abatement" coverage is included under the Business Income Coverage Form, the Court need not address whether additional coverage is also provided by the Condominium Amendatory Endorsement.

## CONCLUSION

THEREFORE, IT IS ORDERED that the Motions are GRANTED, in part, and DENIED, in part, as follows:

1. The Excess Underwriters' motion to dismiss Plaintiff's breach of contract claim is **GRANTED**, and this claim is **DISMISSED** without prejudice.

2. The Excess Underwriters' motion to dismiss Plaintiff's bad faith and UDTPA claims is **GRANTED**, and these claims are **DISMISSED** without prejudice.

3. The Primary Underwriters' motion to dismiss Plaintiff's bad faith and UDTPA claims is **DENIED**.

4. The Agency Defendants' Motion to Dismiss the negligence claims against them is **GRANTED**, and these claims are **DISMISSED**.

SO ORDERED, this the 14th of October, 2021.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases