Aspen Specialty Ins. Co. v. Nucor Corp., 2022 NCBC 19.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ASPEN SPECIALTY INSURANCE
COMPANY; ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY;
PARTNERRE IRELAND INSURANCE
LTD.; HELVETIA SWISS INSURANCE
COMPANY; LEXINGTON INSURANCE
COMPANY; LIBERTY MUTUAL FIRE
INSURANCE COMPANY; LIBERTY
SURPLUS LINES INSURANCE
COMPANY; XL INSURANCE AMERICA,
INC.; ZURICH AMERICAN
INSURANCE COMPANY; and ACE
AMERICAN INSURANCE COMPANY,

        Plaintiffs,

    v.

NUCOR CORPORATION; and NUCOR
STEEL LOUISIANA, LLC,

        Defendants,

    and

XL INSURANCE AMERICA, INC.; and
LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

        Intervening Complaint-
        Plaintiffs,

    v.

NUCOR CORPORATION; and NUCOR
STEEL LOUISIANA, LLC,

        Intervening Complaint-
        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 19887

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
COMPEL**

1. THIS MATTER is before the Court upon Defendants/Intervening Complaint-Defendants Nucor Corporation and Nucor Steel Louisiana, LLC's (collectively, "Nucor") Motion to Compel Responses Related to Claim Reserves ("the Motion") in the above-captioned case. (ECF No. 109.) For the reasons stated below, the Court DENIES the Motion.

> *Hedrick Gardner Kincheloe & Garofalo LLP, by David L. Levy and C. Rob Wilson, and Hinshaw & Culbertson LLP, by David E. Heiss and Peter E. Kanaris, for Plaintiffs Aspen Specialty Insurance Company, Endurance American Specialty Insurance Company, Partnerre Ireland Insurance Ltd., Helvetia Swiss Insurance Company, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Surplus Lines Insurance Company, XL Insurance America, Inc., Zurich American Insurance Company, and Ace American Insurance Company.*
>
> *Moore & Van Allen PLLC, by Jonathan D. Gilmartin and Scott M. Tyler, and Flanagan Partners LLP, by Harold J. Flanagan, Meghan F. Grant, Alixe L. Duplechain, Thomas M. Flanagan, and Camille E. Gauthier, for Defendants/Intervening Complaint-Defendants Nucor Corporation and Nucor Steel Louisiana, LLC.*
>
> *Johnston, Allison & Hord, P.A., by Kimberly J. Kirk, and DLA Piper LLP (US), by Robert C. Santoro and Aidan M. McCormack, for Intervening Complaint-Plaintiffs XL Insurance America, Inc. and Liberty Mutual Fire Insurance Company.*

Earp, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

2. This case arises from an industrial incident that occurred at Nucor's Convent, Louisiana facility in November 2017. (Compl. ¶ 1, ECF No. 3.) The facility processes iron ore into direct reduced iron ("DRI" or "sponge iron") that is then used in the production of steel. (Compl. ¶¶ 17, 22.)

---

[1] The Court does not find facts but refers generally to allegations in the Complaint for background purposes only.

3.     In order to produce sponge iron, marble-sized pieces of iron ore are transported by conveyors equipped with weight belt feeder encoders. (Compl. ¶ 18.) The ore must first be coated with cement before entering a reactor and heated to convert it to DRI. Iron ore that enters the reactor without the cement coating coagulates. (Compl. ¶ 20.)

4.     According to the Complaint, on 7 November 2017, Nucor personnel became aware that iron ore entering the reactor had not been coated with cement. As a result, approximately two thousand four hundred (2,400) metric tons of uncoated ore solidified, forming clusters in the reactor. (Compl. ¶¶ 26–27.) Nucor incurred a loss with respect to the ruined ore, as well as for business interruption and other costs incurred to remove the reactor from service and repair it.

5.     Plaintiffs in this case are ten property insurers (the "Property Insurers") that contracted with Nucor to insure its property under the terms of their policies. Intervening Complaint-Plaintiffs are two insurers (the "EB Insurers"; together with the Property Insurers, the "Insurers") that contracted to insure Nucor for risks related to equipment breakdown under the terms of their policies. Both the Property Insurers and the EB Insurers assert claims for declaratory judgment asking the Court to determine whether there is coverage under their respective policies for the losses incurred by Nucor. (*See* ECF Nos. 3, 6.) Nucor, in turn, counterclaims for declaratory relief and breach of contract. (*See* ECF Nos. 25–26.)

6.     Pursuant to the Fifth Amended Case Management Order entered 1 December 2021, (ECF No. 108), the parties have exchanged documents and other

written discovery. However, each of the Insurers objects to Nucor's interrogatories and requests for production that would require them to disclose information relating to their reserves. Therefore, after appropriately exhausting the Business Court Rule 10.9 process, on 7 February 2021, Nucor filed its Motion to Compel seeking an order requiring the Insurers to provide their reserve information. The Insurers filed responses opposing production of this information. (ECF Nos. 123, 125.) The Court heard from the parties at a hearing on 12 April 2022. The Motion is now ripe for disposition.

## II. LEGAL STANDARD

7. The scope and limits of discovery are defined in Rule 26(b) of the North Carolina Rules of Civil Procedure (the "Rules(s)"):

> (b) Discovery scope and limits. – Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) In General. – Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence[.]

N.C. R. Civ. P. 26(b)(1).

8. The standard for determining relevance is less demanding with respect to discovery than it is for admissibility, but it is not nonexistent. *See Addison Whitney, LLC v. Cashion,* 2020 NCBC LEXIS 72, at *7 (N.C. Super. Ct. June 10, 2020) ("Rule 26, though generous, should not be construed as an invitation for parties to roam at

will in the closets of others." (citation and internal quotation marks omitted)); *Howard v. IOMAXIS, LLC*, 2022 NCBC LEXIS 6, at \*6 (N.C. Super Ct. Jan. 27, 2022) ("[A] party seeking discovery in not entitled to a fishing expedition to locate it." (internal quotation marks and citation omitted)); *see also Willis v. Duke Power Co.*, 291 N.C. 19, 34 (1976) ("One party's need for information must be balanced against the likelihood of an undue burden imposed upon the other.").

9.     "[I]t is . . . clear under the Rules that North Carolina judges have the power to limit or condition discovery under certain circumstances." *DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at \*23 (N.C. Super. Ct. May 12, 2015) (citation omitted). Generally, "orders regarding discovery matters are within the discretion of the trial court and will not be upset on appeal absent a showing of abuse of that discretion." *Nationwide Mut. Fire Ins. Co. v. Bourlon*, 172 N.C. App. 595, 601 (2005), *aff'd*, 360 N.C. 356 (2006) (citation omitted).

## III.    ANALYSIS

10.    Although there is limited caselaw in North Carolina, whether reserves are discoverable is an important issue that has divided both courts and commentators for decades. *See, e.g.*, Douglas R. Richmond, *Recurring Discovery Issues In Insurance Bad Faith Litigation*, 52 Tort & Ins. L.J. 749, 780 (2017) ("[T]his is a complex and confused area of the law."); Ann F. Ketchen, *Reserve and Reinsurance Information: Is It Discoverable?,* 38 The Brief 40, 40 (2009) ("In almost every large insurance litigation, inevitably a dispute over whether insurance reserves . . . are discoverable will occur. Not surprisingly, insurers and insureds have diametrically opposite

views."). However, there is no real disagreement among the state and federal courts that have considered the issue that for reserve information to be discoverable, it must be both: (a) relevant to the litigation; and (b) not protected from discovery by either the attorney-client privilege or the work product doctrine.

11. At the hearing, Nucor's counsel represented that Nucor is not seeking to compel the production of any reserve information that post-dates the filing of this action on 4 November 2019. Consequently, the Insurers did not argue application of the attorney client privilege or the work product doctrine as bases for protection from discovery of the information in question.

12. Thus, the central issue here is whether reserve information is relevant given the claims presently asserted in this case. To determine relevance in this context, a court must "thoroughly consider[ ] the specific way the particular insurance company in a particular case determines reserves for . . . particular claim[s]," as well as "the nature of the underlying litigation and the purpose for which the information is sought." *State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone*, 625 S.E.2d 355, 359–60 (W. Va. 2005).

13. Several factors influence those considerations in this case. First, reserves are not merely a business tool that an insurer may or may not choose to employ. North Carolina law requires insurers to set reserves. *See* N.C.G.S. § 58-3-75 (addressing loss and loss expense reserves of fire and marine insurance companies);

N.C.G.S. § 58-3-81 (addressing loss and loss expense reserves of casualty insurance and surety companies).[2]

14.     In general, an insurer may calculate its reserves "in accordance with any method adopted or approved by the NAIC[,]"[3] but the statutes afford the North Carolina Commissioner of Insurance authority to impose a different method if, in the Commissioner's determination, the reserves are not adequate or reasonable. *See* N.C.G.S. §§ 58-3-75, 58-3-81(e).

15.     When it is required by law, courts have held that the existence and amount of a reserve is not an admission by a carrier that either coverage exists, or that the carrier would be willing to pay the reserve amount to resolve a case through settlement. *See, e.g.*, *J.C. Assocs. v. Fid. & Guar. Ins. Co.*, Civil Action No. 01-2437 (RJL/JMF), 2003 U.S. Dist. LEXIS 6145, at *5 (D.D.C. Apr. 15, 2003) ("[A] reserve figure is not an admission unless it is in fact an assessment of liability rather than the product of state law or regulation or driven by tax and other financial considerations.")[4]; *Silva v. Basin W., Inc.*, 47 P.3d 1184, 1190 (Colo. 2002) ("Statutory requirements[ ] [and] limitations in the evaluation . . . limit the usefulness of

---

[2] The Property Insurers allege that their policies contain a choice of law endorsement providing that "[t]he law under which the terms and conditions of this policy shall be interpreted shall be the law of North Carolina." (Compl. ¶ 14.) The EB Insurers request a declaratory judgment under North Carolina law. (Int. Compl. ¶ 26, ECF No. 6.)

[3] NAIC is the trade name for the National Association of Insurance Commissioners.

[4] "North Carolina courts routinely look to federal decisions for guidance on procedural matters." *Lee v. McDowell*, 2021 NCBC LEXIS 77, at *7 n.5 (N.C. Super. Ct. Sept. 14, 2021); *see also Turner v. Duke Univ.*, 325 N.C. 152, 164 (1989) ("Decisions under the federal rules are . . . pertinent for guidance and enlightenment in developing the philosophy of the North Carolina rules."); *Dickens v. Puryear*, 302 N.C. 437, 442 (1981) (noting that "it is customary . . . to look for guidance in interpreting our rules to federal rules decisions").

reserves . . . as valuations of a claim."); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 623 A.2d 1099, 1109–10 (Del. Super. Ct. 1991) ("[T]he establishment of reserves is an appropriate business decision justified by the necessity of preserving financial stability. . . . Reserves do not represent an admission or evaluation of liability and are irrelevant to the issues between insurer and insured.").

16.     Moreover, each insurance company has its own "reserve philosophy" used for setting reserves, which may range from the use of actuarial or formula-based calculations, to calculations that strike a balance between best-case and worst-case scenarios, to estimates of "Probable Ultimate Cost" on a particular claim, among others. (*See* ECF Nos. 110.15–.43, 123.1–.8 (Insurers' reserve guidelines) (under seal).) The method used to calculate a reserve impacts its relevance. *See, e.g.*, *Mazzone*, 625 S.E.2d at 359 (insurer may persuasively argue that a reserve calculated based on coverage losses over time or past experience has little relevance to the issues in an individual claim).

17.     The timing of both establishing and adjusting reserves also varies by company. Some insurers set a reserve "at the earliest reasonable point in the life of the claim." Others require that the reserve be set within sixty calendar days of receipt of a new loss. Still others require an initial reserve to be set within one business day of the claim.[5] (*See* ECF Nos. 110.15–.43, 123.1–.8 (under seal).)

---

[5] Timing may or may not be relevant in a coverage case in which notice to the carrier is in dispute. *See, e.g.*, *Savoy v. Richard A. Carrier Trucking, Inc.,* 176 F.R.D. 10, 12 (D. Mass. 1997).

18. As a consequence, it is folly to generalize about the meaning of a particular reserve given the various inputs and the range of philosophies that could have been used to develop it. Instead, each individual insurer's inputs into and process for setting reserves must be examined on a case-by-case basis before conclusions can be fairly reached about that entity's decision-making. Consequently, production of an insurer's reserve information on a particular claim is only the beginning of the inquiry with respect to the relevance of the information. *See Sundance Cruises Corp. v. American Bureau of Shipping*, 87 Civ. 0819 (WK), 1992 U.S. Dist. LEXIS 3759, at *3 (S.D.N.Y Mar. 31, 1992) ("[R]eserves are, simply, not relevant. . . . Furthermore, to allow evidence of the amount of reserves set aside for any particular incident would get this trial into mini-litigations over what was in the minds of the persons who set the reserve to uncover why each particular reserve was set[.]").

19. In addition to analyzing the facts with respect to the multiple inputs and varying processes used to set reserves, when determining whether reserve information is relevant to a particular action, there must be a determination regarding whether the information appears reasonably likely to lead to the discovery of admissible evidence. *See, e.g.*, *Wagoner v. Elkin City Schs.' Bd. of Educ.*, 113 N.C. App. 579, 585 (1994) ("Under the rules governing discovery, a party may obtain discovery concerning any unprivileged matter as long as relevant to the pending action and reasonably calculated to lead to the discovery of admissible evidence." (citing N.C. R. Civ. P. 26(b)). In that regard, the body of case law that has developed

over the years draws a distinction between first-party coverage cases and "bad faith" cases.

20. The weight of authority is that reserve information is generally not discoverable in coverage cases, which turn largely on an interpretation of the language of the policy. *See, e.g.*, *Am. Prot. Ins. Co. v. Helm Concentrates, Inc.*, 140 F.R.D. 448, 450 (E. D. Cal. 1991) (in a coverage case, "[p]otential liability or the insure[r's] estimation as to its potential liability is marginally relevant at best"); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 117 F.R.D. 283, 288 (D.D.C. 1986) (reserve information has "tenuous relevance, if any relevance at all" to coverage issues).

21. If the language of the policy is unambiguous, it is interpreted on its face. *See, e.g.*, *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008) ("A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." (internal citations omitted)); *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."); *see also Villa Capriani Homeowners Ass'n v. Lexington Ins. Co.*, 2021 NCBC 67, 2021 NCBC LEXIS 93, at *9 (N.C. Super. Ct. Oct. 14, 2021) ("[O]ur Supreme Court has instructed that '[w]hen interpreting an insurance policy, courts apply general contract interpretation rules.' " (quoting *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020)).

22. If the language of a contract is ambiguous and extrinsic evidence is considered, it is to determine the intent of the parties at the time the contract was

formed, not at some later time, such as the date the claimant's insurers set their reserves. *See, e.g.*, *Root v. Allstate Ins. Co.*, 272 N.C. 580, 587 (1968) ("Whenever the terms of a written contract . . . are susceptible of more than one interpretation, . . . extrinsic evidence may be introduced to show what was in the minds of the parties *at the time of making the contract or executing the instrument*[.]" (emphasis added) (citation omitted)). Thus, reserve information does not assist typical contract interpretation.

23. However, the state of mind of the carrier's agents as reflected in reserve information may be relevant when bad faith or other tortious conduct is alleged. *See, e.g.*, *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 138–139 (S.D.N.Y. 2012) (conceding that reserve information might be irrelevant to a coverage dispute but finding it relevant when insured alleged bad faith on the part of the insurer and the insurer asserted fraud against insured); *Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100, 1107 (N.D. Cal. 2006) (noting that the state's case law "clearly demonstrates that [their] courts will be open to arguments in bad faith cases about the relevance of evidence about reserves"). Whether and when a reserve was established for a claim could provide evidence of the carrier's investigation and evaluation of that claim. *See, e.g.*, *Athridge v. Aetna Casualty & Surety Co.*, 184 F.R.D. 181, 192 (D.D.C 1998) (stating that "[u]nder the broad standard of relevance at the discovery stage, the information sought will to some degree demonstrate the thoroughness with which [the insurer] investigated and considered [the insured's] claim and thus is relevant to the question of good or bad faith of defendant in denying

to indemnify or defend [the insured]" (internal quotation marks omitted)); *U.S. Fire Ins. Co. v Bunge N. Am., Inc.*, 244 F.R.D. 638, 645 (D. Kan. May 25, 2007) (holding that reserve information is relevant and subject to production in case where bad faith asserted).

24.     While there are many decisions regarding the discoverability of reserves from other jurisdictions, the Court is aware of only one reported decision from this State's courts. *See Wachovia Bank, N.A. v. Clean River Corp.*, 178 N.C. App. 528 (2006). However, the claims in that case distinguish it from this one.

25.     Plaintiff Wachovia Bank, N.A. was one of several lenders on a construction project. *Id.* at 529. A contract between the lenders and the construction company required the construction company to maintain builder's risk insurance coverage that included the lenders as additional insureds. However, the construction company failed to name the lenders as additional insureds on the policy it obtained. *Id.* Therefore, when a claim for water and mold damage was made, the carriers indemnified the builder but refused to consider the lenders' claims because they contended that the lenders were not insureds. *Id.* at 529–530. After the builder's claim was settled, the project manager, who had also contributed financially, reported that he believed the builder's claim was fraudulent. *Id.* at 530. His attorney wrote a letter to the carriers asserting a claim on the policy and, importantly, alerting them that the project manager intended to file suit if the claim was not paid. *Id.* When he later filed suit alleging claims for breach of contract, misrepresentation, bad faith, and breach of fiduciary duty, the carriers refused to produce reserve information in

discovery. *Id.* Rejecting arguments that reserve information is not discoverable, the trial court ordered production of the information to the extent it was generated *prior* to the time the attorney-client privilege was in place. *Id.* Information generated after that date, it reasoned, was subject to work product qualified immunity. *Id.* On appeal, the Court of Appeals affirmed. *Id.* at 534.

26. Thus, *Wachovia Bank* establishes that reserves are not categorically off limits in discovery as long as they are not shielded by privilege or qualified immunity. However, *Wachovia Bank* does not address the relevance of reserve information where, as here, bad faith and misrepresentation claims are not alleged.[6]

27. The United States District Court for the Eastern District of North Carolina addressed the discoverability of reserves in *PCS Phosphate Co. v. Am. Home Assurance Co.*, No. 5:14-CV-99-D, 2015 U.S. Dist. LEXIS 165548 (E.D.N.C. Dec. 10, 2015), a case involving PCB contamination at a Superfund site in Raleigh. Plaintiff ("PCS") notified its carrier, American Home, and asserted a claim after the Environmental Protection Agency identified it as a potentially responsible party. *Id.* at *3. American Home agreed to defend but only subject to a reservation of rights, prompting PCS to file suit against its carrier alleging bad faith for failure to "defend and indemnify it without reasonable basis despite acknowledging that PCS had

---

[6] The Court does not intend to suggest that reserve information is automatically relevant for discovery purposes in every action that includes a bad faith claim. There are undoubtedly instances when it would not be. *See e.g.*, *Fidelity & Deposit Co. of Md. v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996) (reserve information not discoverable despite bad faith allegation when the central issue is interpretation of policy). "The burden of showing that the discovery is not relevant falls on the party resisting discovery." *DSM Dyneema, LLC*, 2017 NCBC LEXIS 226, at *2 (citation omitted).

presented valid claims" and seeking a declaratory judgment with respect to American Home's duties to it under the policy. *Id.* at *9. PCS then propounded discovery requests that included requests for reserve information, and American Home moved for a protective order. *Id.* at *4.

28. Recognizing that "[t]he scope of relevancy under discovery rules is broad[,]" the federal court overruled the carrier's relevancy objection, as well as its stated concern that reserve information, if produced, could be misinterpreted as an admission of liability. *Id.* at *5–6 (quoting *Carr v. Double T Diner*, 272 F.R.D. 431, 433 (D. Md. 2010)). The court found that the request for reserve information "falls within the scope of permissible discovery *based upon the claims asserted in this matter*[,]" which included bad faith, and the carrier's late notice defense—claims the court found went well "beyond those of policy interpretation." *Id.* at *9, *13 (emphasis added).

29. In contrast, the case before the Court involves only breach of contract and declaratory judgment claims. There is no bad faith claim.

30. In response to Nucor's stated desire to review the requested reserve information as part of its investigation regarding a *possible* bad faith claim, the EB Insurers cite *Willis v. Duke Power Co.*, 291 N.C. 19 (1976), and *Dworsky v. Travelers Ins. Co.*, 49 N.C. App. 446 (1980), for the proposition that North Carolina courts do not countenance discovery "fishing expeditions." They argue that Nucor's use of discovery tools to determine whether to bring such a claim in the first place is improper. (EB Insurers' Mem. Opp'n Nucor's Mot. Compel 2, ECF No. 125.)

31.    The Property Insurers add that they do not believe that a bad faith claim could possibly exist because of the "high hurdle" for such a claim established in *Newton v. Standard Fire Ins. Co.,* 291 N.C. 105 (1976).  Therefore, they contend that production of reserve information would add nothing of value to Nucor's decision calculus with respect to such a claim.

32.    At this point, the Court observes only that the claims and counterclaims alleged in this coverage case do not include a claim for bad faith, and well-reasoned authority holds that reserve information is generally not relevant to, and therefore not discoverable in, first-party coverage litigation.  Further, Nucor's argument with respect to the relevance of reserve information in the absence of a bad faith claim is thin.  *See, e.g.*, *Atlanta Channel, Inc. v. Solomon*, Civil Action No.: 15-1823 (RC), 2020 U.S. Dist. LEXIS 216969, at *16 (D.D.C. Nov. 18, 2020) (denying discovery when presented with a "hypothetical claim of bad faith").  Coupling these facts with the fact that the Insurers were required by statute to create the reserve information,[7] and with the confidential, proprietary, and varying nature of their reserve philosophies, the Court is disinclined to subject the Insurers' reserves to scrutiny absent a clearer showing that such information meets even the less demanding standard of relevance necessary for purposes of discovery.

---

[7] The Court is mindful of the impact that routinely subjecting reserves to discovery could have on the process by which they are set.  There is obvious tension between using conservative accounting methods to establish sufficient reserves to guard against insolvency and the tendency that could well develop to set reserves artificially low to counter risk that they will be used as an admission of liability and approximation of damages in litigation.  Therefore, for public policy considerations, the relevance of reserve information to the claims at issue should be more readily apparent than it is in the case at bar.

## IV.   CONCLUSION

33.   WHEREFORE, the Court, in the exercise of its discretion, hereby DENIES Nucor's Motion to Compel Responses Related to Claim Reserves.

IT IS SO ORDERED, this the 22nd day of April, 2022.


/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases